## CASE 3:18-CV-09187-PGS-LHG

THESE DOCUMENTS ARE PRIVATE MATERIAL AND ARE NOT TO BE VIEWED, COPIED, USED, SHARED, OR EXPLOITED IN ANY WAY BY ANYONE. THESE DOCUMENTS CONTAIN CONFIDENTIAL INFORMATION. IT WOULD BE ABSUIVE FOR ANYONE INSIDE OR OUTSIDE OF THE US DISTRICT COURT TO USE THESE DOCUMENTS FOR THEIR OWN BENEFIT. IT WOULD BE ABUSIVE FOR ANYONE OR ANY WEBSITE OR DATABASE TO USE THIS INFORMATION OR TO DISCLOSE THIS INFORMATION. DO NOT VIEW THESE DOCUMENTS UNLESS AUTHORIZED TO DO SO. THESE DOCUMENTS MUST BE PROTECTED FROM ABUSE BY THE COURT.

CASE

BONNER V. JUSTIA INCORPORATED

3:18-CV-09187-PGS-LHG

Plaintiff must say that if the case is dismissed right away, it is a violation of constitutional rights. Violating someone's constitutional rights is also a violation of other federal statutes such as 18 U.S.C. 241, 18 U.S.C. 242, 18 U.S.C. 245, and 42 U.S.C. 14141. Such willful violations of civil rights can also be prosecuted under fraud statutes. Dismissing the case at this stage would be violating procedure also because it would be dismissing without allowing a discovery period, depositions, or interrogatories. A quick dismissal would also be causing undue hardship by forcing the appeals court to handle the case and send it back down. The case can proceed in this court as it is without the undue hardships caused by violating the plaintiff's constitutional rights.

Sincerely With Dignity And Respect,

Plaintiff: Andrew K. Bonner Jr.

Plaintiff fully believes Justia Incorporated is guilty of violating the Espionage Act of 1917 due to their computer intrusion code sharing that they use to retrieve information from the U.S. District Courts whenever they want to.

Because Plaintiff has already entered documents about his very sensitive business endeavors that would likely require security clearance, the case documents must be sealed. To the furthest extent of thought and possibility, it could be dangerous for such things to be accusingly relayed to a different country's government or a wrong person by this espionage business Justia Incorporated. Plaintiff has evidence that Justia Incorporated engages in things that he believes are actually violations of the Espionage Act of 1917. Namely, their sharing of computer code information for retrieving court data at any time they so please, even if the court is closed. Plaintiff must explain that he is just an American citizen who was seeking to use the court for litigating his case in which he could have special employment terms to suit his life. Justia Incorporated makes it so that the court cannot be used for such things because their computer trickery retrieves the case information so quickly that exposure can almost not be avoided in any way. Justia Inc. is impeding on other people's ability to use the U.S. District Court. Because Justia Inc. engages in such illegal business, Plaintiff is going to want his winning compensation to either be in cash or most likely in the form of attorney representation in which Plaintiff will be facilitated free attorney services, and he can then register stock in his own business. Plaintiff does not want any business ties, property ties, or financial ties to Justia Inc. or its founders or owners.

Also, Justia Inc. has already taunted Plaintiff and taunted the court by saying that they doubt that he can recover a 750,000 dollar judgment amount from them. They obviously think

they can escape liability even though they are exploiting others for their own gains. They obviously must think they can do and take whatever they want in this state of New Jersey. Justia Inc. and its haughty attorneys have no respect for the Judge, no respect for the Jury, and no respect for the U.S. Marshal's Service. Plaintiff must say that the judge has a duty to the U.S. District Court as a judicial officer of the United States and he knows this case will not be dismissed without a trial by jury.

N.J.S.A. 2C:13-7 Luring, enticing an adult

Justia.com is a website with a small amount of traffic. They target certain people's information on purpose. They commit the crime of luring by targeting your legal information, putting it on their website, and then they know that you will be appalled when you see that they have your information so of course you will proceed to visit the website to see what they are doing with your information. Any website is able to record the IP Address of any device that visits the site. If you visit their site a lot because they have your information they will be able to pinpoint your IP Address from your specific cell phone or computer. In a situation such as this case where Plaintiff is in a heated legal battle against Justia Inc. of course Plaintiff does not want to keep visiting their website. They must be ordered to stop posting about this case. Also they continue to steal docket data and documents for free and defraud the court of proper copying fees.

Also, Eugene Volokh has tried to enter himself into this case with the threat that he is going to write about plaintiff and his case on his website. Eugene Volokh wants to lure Plaintiff to his website. The information and documents entered in this case must be sealed and protected from Eugene Volokh. Plaintiff has submitted FBI Complaints and New Jersey State Police Complaints in an effort to get Eugene Volokh to stop harassing him. Eugene Volokh is a direct enemy of the Plaintiff.

The judge must take it seriously that websites have an uncanny ability to collect data. The judge must order the documents of the case to be sealed so they can be protected from any and all data theft computer intrusion websites. Justia Inc. and Eugene Volokh are both affiliated with something called the Free Law Project, so they are friendly with each other. All they want to do is lure Plaintiff to their websites and continue to keep targeting certain individuals on purpose.

They lure with the purpose of trying to illegally stalk people. They lure with the purpose of illegally surveilling. They take records of filings immediately from the court computers so they can watch your case entries in accordance with dates and times and your schedule.

Justia Inc. regularly commits the crimes of misappropriation and embezzlement and then that misappropriation and embezzlement is used to lure individuals who have had their property and information exploited and targeted.

Every time Eugene Volokh mails something to the Plaintiff or tries to contact Plaintiff, Plaintiff notifies the New Jersey State Police. Eugene Volokh is trying to compulsorily force his assertions of wordy reasoning and permanently forbid Plaintiff from ever succeeding in sealing the documents of his own case. Quite frankly, Eugene Volokh needs to mind his own business and stay out of the matters of this case. Eugene Volokh is obstructing justice because Plaintiff now wants to withhold his documents and testimony until he can correlate action by law enforcement authorities against Eugene Volokh for his harassment. Plaintiff cannot enter his private documents now because this pest Eugene Volokh is trying to affect the case, embarrass, and slander the plaintiff. It doesn't matter what his intentions are, obstructing justice and intimidation of a witness is based on the effect of what the perpetrator is doing. Eugene Volokh's harassment is having the effect of obstructing justice and intimidating a witness. Plaintiff refuses to entertain anything Eugene Volokh ha sent to the court. Even as a pro se plaintiff, Plaintiff is still entitled to this same right of protection that any attorney would provide to shield a client against a harasser's ridiculous attempts to mess up Plaintiff's testimony.

Just because this is U.S. District Court does not mean that this is a free-for-all or some silly bullcrap for everyone to think they can mess in anyone's litigation. The court is used as a place of administering the law to private disputes. This is not the public's case and Plaintiff will not entertain Eugene Volokh's distractions.

This idiot Eugene Volokh is not a credible person. Eugene Volokh has been scamming UCLA for years and received what Plaintiff considers to be a fraudulent undergraduate degree from them. Eugene Volokh is part of a computer intrusion ring that calls themselves the Free Law Project. They operate several websites in California that intrude into court computers to take documents so they can sell them for their own profit. Three of these websites are justia.com,

courtlistener.com, and unicourt.com. Eugene Volokh is trying to interfere with his request to permanently forbid Plaintiff from ever sealing any documents of this case in order to try and hedge off lawsuit against the other websites he is affiliated with. Eugene Volokh is trying to intervene into this case to cover over illegal things already done by these other websites and try to give them some type of justifiable defense. Eugene Volokh is only trying to aid and abet the greedy illegal activity that is already happening. This criminal facilitator Eugene Volokh is only seeking to retaliate and intervene in order to protect a data theft ring of activity that he has a major part in. Eugene Volokh preys on doing what he thinks are smaller crimes that are less prosecuted on the federal level and also targeting data in different states. Eugene Volokh is only trying to get a motion order in this case that protects his own fraudulent gains by way of embezzlement, misappropriation, hacking, data theft, and computer intrusion. The FBI takes computer intrusion very seriously and charges that crime for the same things that Mr. Volokh has his Free Law Project websites doing. Computer intrusion can even be charged for exceeding authorized access. No motion order to Eugene Volokh's benefit or liking can be made in this case because it would be aiding and abetting a major player in a data theft ring.

The Defendants are asking for a dismissal with prejudice in an attempt to be malicious. They want to take away the plaintiff's right to ever have grievance against them, keep Plaintiff's information publicly available, and hurt Plaintiff's background checks with the government. There is no other reason to be firmly fixed on keeping someone's information public despite your ability to delete it, other than to be trying to hurt the person whose information you have. Justia Inc. violates the normal person's expectation of privacy and decency when they target someone for the information they want. I would never expect a company to use the means of computer theft force the Justia Inc. uses. I would never expect the U.S. District Court computer systems to be so weak. I would never expect for there to be no one who detected this company's security breaching and computer intrusion earlier. No common person expects for Justia Inc. to target them personally. No one expects for Justia Inc. to stalk their every communication and every filing they make in court. Most notably, no one expects Justia Inc. to be able to hack and intrude into court computers even on days when the court is not open, in their attempts to retrieve information, because doing so is illegal, doing so is theft and possibly robbery because of their use of computer technology as a means of force to take what they want whenever they want. Justia Inc.'s theft and theft attempts are atrocious and are not legal or tolerable because of laws against such things.

Because of things Plaintiff has already said in documents entered, and because of things Plaintiff must say in future documents, the filings of the case must be sealed. If anyone besides Andrew or Justia's attorney for this case were to access and have freedom and power to do whatever they want with the documents of this case and information it contains, it could prove to be very harmful to Andrew. Andrew must be allowed to keep control over his own information. All documents of this case must be sealed. Andrew did have more to say to stress the importance

of sealing the documents of this case, but he cannot say what he was going to say fully out of fear that the judge could choose to rule any way he so desires and possibly and up not allowing the sealing of the documents. No further wordy standard that can be conjured up as if it is precedent should need to be made. Andrew states firmly that Eugene Volokh has absolutely no right to attain the documents of this case. Also, Andrew states firmly that all documents in this case should be sealed at the appropriate time and not hinder the continuing of the action to its proper jury trial. If the appropriate time to seal them to protect them from any disclosure would be now then they should be sealed now.

An FBI report has been made concerning Mr. Eugene Volokh's letter that he mailed to Plaintiff. The FBI report contains allegations of tampering with a witness victim or informant, fraud by coercion, bribery, mailing threatening communications, cyber harassment, cyber extortion, cyber stalking, blackmail, making communications to cause alarm to a person, influencing a judge or juror by writing, and mailing a package sealed with irritating material.

Plaintiff has made reports to the FBI and New Jersey State Police about data theft websites being run at the University of California. Plaintiff has made reports to the FBI and New Jersey State Police about data theft websites being run at the University of California by professors at the school. Plaintiff has made reports to the FBI and New Jersey State Police about data theft websites being run in California and those reports have been acted upon and yielded results of law enforcement action. Mr. Eugene Volokh is not an honest journalist. This is a retaliation letter that he has sent to Judge Peter G. Sheridan and to Andrew the Plaintiff. Eugene Volokh is likely a co-conspirator with the other University of California professors that Andrew has already reported to law enforcement. Eugene Volokh is faking journalistic inquiry and attempting to affect the case judgment as his way of retaliating against Andrew's attempt to clear his own name and reputation on the internet. Eugene Volokh is retaliating by witness tampering and obstructing justice. Eugene Volokh is only trying to achieve his own ends and is trying to influence the judgment orders of Andrew's case. This is Andrew's case, this has nothing to do with Eugene Volokh and Eugene Volokh is not a party in this case. Eugene Volokh just wants to achieve his goal of influencing the judgment, annoying the Plaintiff, and making sure Andrew's case information stays open and vulnerable to electronic theft and rapid internet sharing in a way that defrauds the court of proper copying fees, victimizes Andrew, exasperates Andrew, and creates another internet problem for Andrew to contend with. Eugene Volokh's ominous letter is

harassing and scaring Andrew, and Eugene Volokh must not be allowed to continue to intimidate Andrew, harass Andrew, stalk Andrew, or obstruct justice.

- Justia Inc. is a private company only seeking their own gains

- Justia Inc. uses technology to take records from the court so they don't have to pay for them

- Justia Inc. may sell their website and all information it has accrued just like they did before because they want personal gains

- Part of what their business does is considered espionage according to the Espionage Act of 1917 and Andrew told the state police he is willing to be a witness in an espionage charge against them

- Justia Inc. was sued by the State of Oregon for stealing documents

- Justia Inc. has been sued before by others

- The FBI warns against providing large amounts of data to anyone, so the means by which Justia is getting the information they get through use of wire and electronic transfer methods is fraudulent and not sanctioned nor approved

- Justia Inc.'s owners are affiliated with a Free Law Project movement and they are called legal rebels because they know what they are doing is wrong

- Such a movement as the Free Law Project and imposing the force of data intrusion and other technology on a government or its citizens is considered terrorism. If they are American citizens it is domestic terrorism, but they share their methods with other countries including Mexico so they aid in international terrorism.

- Justia Inc.'s attempt at making personal gains by imposing data technology and data availability standards on the court could be considered economic espionage and terrorism.

- Eugene Volokh is a criminal defendant in a case of harassment against Andrew the plaintiff. Andrew has recently filed this harassment complaint that is in municipal criminal court

-

This case Bonner v. Justia Incorporated is able to sustain a trial by jury under the preponderance of evidence standard. Plaintiff must not be disparaged of his 7th Amendment Right to a trial by jury in this case.

## Amendment VII

## JURY TRIAL IN CIVIL LAWSUITS

**Passed by Congress September 25, 1789. Ratified December 15, 1791. The first 10 amendments form the Bill of Rights**

**In Suits at common law, where the value in controversy shall exceed twenty dollars, the right of trial by jury shall be preserved, and no fact tried by a jury, shall be otherwise reexamined in any Court of the United States, than according to the rules of the common law.**

**Legal Definition of *preponderance of the evidence***

: the standard of proof in most civil cases in which the party bearing the burden of proof must present evidence which is more credible and convincing than that presented by the other party or which shows that the fact to be proven is more probable than not.

https://www.merriam-webster.com/legal/preponderance%20of%20the%20evidence

"Preponderance of the evidence means that degree of relevant evidence which a reasonable person, considering the record as a whole, would accept as sufficient to support a conclusion that the matter asserted is more likely to be true than not true." (Code of Federal Regulations: 4 CFR § 28.61 - Burden and degree of proof.
https://www.law.cornell.edu/cfr/text/4/28.61)

4 CFR § 28.61 - Burden and degree of proof.

**§ 28.61 Burden and degree of proof.**

**(a)** In appealable actions, as defined by 5 U.S.C. 7701(a), agency action must be sustained by the Board if:

**(1)** It is a performance-based action and is supported by substantial evidence; or

**(2)** It is brought under any other provision of law, rule, or regulation as defined by 5 U.S.C. 7701(a) and is supported by a preponderance of evidence.

**(b)** Notwithstanding paragraph (a) of this section, the agency's decision shall not be sustained if the petitioner:

**(1)** Shows <u>harmful error</u> in the application of the agency's procedures in arriving at such decision;

**(2)** Shows that the decision was based on any prohibited personnel practice described in <u>4 CFR 2.5</u>; or

**(3)** Shows that the decision was not in accordance with law.

**(c)** In any other action within the <u>Board</u>'s jurisdiction, the <u>petitioner</u> shall have the responsibility of presenting the evidence in support of the action and shall have the burden of proving the allegations of the <u>appeal</u> by a <u>preponderance of the evidence</u>.

**(d)***Definitions.* For purposes of this section, the following definitions shall apply:

*Harmful error* means error by the agency in the application of its procedures which, in the absence or cure of the error, might have caused the agency to reach a conclusion different from the one reached.

*Preponderance of the evidence* means that degree of relevant evidence which a reasonable <u>person</u>, considering the record as a whole, would accept as sufficient to support a conclusion that the matter asserted is more likely to be true than not true.

*Substantial evidence* means that degree of relevant evidence which a reasonable <u>person</u>, considering the record as a whole, might accept as adequate to support a conclusion, even though other reasonable <u>persons</u> might disagree. This is a lower standard of proof than <u>preponderance of the evidence</u>.

[<u>58 FR 61992</u>, Nov. 23, 1993, as amended at <u>68 FR 69302</u>, Dec. 12, 2003]

Disparaging 7th Amendment Constitutional Rights is illegal.

## Title 18, U.S.C., Section 241 - Conspiracy Against Rights

This statute makes it unlawful for two or more persons to conspire to injure, oppress, threaten, or intimidate any person of any state, territory or district in the free exercise or enjoyment of any right or privilege secured to him/her by the Constitution or the laws of the United States, (or because of his/her having exercised the same).

It further makes it unlawful for two or more persons to go in disguise on the highway or on the premises of another with the intent to prevent or hinder his/her free exercise or enjoyment of any rights so secured.

Punishment varies from a fine or imprisonment of up to ten years, or both; and if death results, or if such acts include kidnapping or an attempt to kidnap, aggravated sexual abuse or an attempt to commit aggravated sexual abuse, or an attempt to kill, shall be fined under this title or imprisoned for any term of years, or for life, or may be sentenced to death.

https://www.fbi.gov/investigate/civil-rights/federal-civil-rights-statutes

Disparaging 7th Amendment Constitutional Rights is illegal.

## Title 18, U.S.C., Section 242 - Deprivation of Rights Under Color of Law

This statute makes it a crime for any person acting under color of law, statute, ordinance, regulation, or custom to willfully deprive or cause to be deprived from any person those rights, privileges, or immunities secured or protected by the Constitution and laws of the U.S.

This law further prohibits a person acting under color of law, statute, ordinance, regulation or custom to willfully subject or cause to be subjected any person to different punishments, pains, or penalties, than those prescribed for punishment of citizens on account of such person being an alien or by reason of his/her color or race.

Acts under "color of any law" include acts not only done by federal, state, or local officials within the bounds or limits of their lawful authority, but also acts done without and beyond the bounds of their lawful authority; provided that, in order for unlawful acts of any official to be done under "color of any law," the unlawful acts must be done while such official is purporting or pretending to act in the performance of his/her official duties. This definition includes, in addition to law enforcement officials, individuals such as Mayors, Council persons, Judges, Nursing Home Proprietors, Security Guards, etc., persons who are bound by laws, statutes ordinances, or customs.

Punishment varies from a fine or imprisonment of up to one year, or both, and if bodily injury results or if such acts include the use, attempted use, or threatened use of a dangerous weapon, explosives, or fire shall be fined or imprisoned up to ten years or both, and if death results, or if such acts include kidnapping or an attempt to kidnap, aggravated sexual abuse or an attempt to

commit aggravated sexual abuse, or an attempt to kill, shall be fined under this title, or

imprisoned for any term of years or for life, or both, or may be sentenced to death.

https://www.fbi.gov/investigate/civil-rights/federal-civil-rights-statutes

Eugene Volokh should leave Plaintiff alone. Stop harassing Plaintiff. Justia Incorporated must also stop harassing Plaintiff and stop trying to cause reputation injury to Plaintiff.

## Title 18, U.S.C., Section 245 - Federally Protected Activities

1) This statute prohibits willful injury, intimidation, or interference, or attempt to do so, by force or threat of force of any person or class of persons because of their activity as:

   a.   A voter, or person qualifying to vote...;

   b.   a participant in any benefit, service, privilege, program, facility, or activity provided or administered by the United States;

   c.   an applicant for federal employment or an employee by the federal government;

   d.   a juror or prospective juror in federal court; and

   e.   a participant in any program or activity receiving Federal financial assistance.

2) Prohibits willful injury, intimidation, or interference or attempt to do so, by force or threat of force of any person because of race, color, religion, or national origin and because of his/her activity as:

   a.   A student or applicant for admission to any public school or public college;

   b.   a participant in any benefit, service, privilege, program, facility, or activity provided or administered by a state or local government;

   c.   an applicant for private or state employment, private or state employee; a member or applicant for membership in any labor organization or hiring hall; or an applicant for employment through any employment agency, labor organization or hiring hall;

    d.   a juror or prospective juror in state court;

    e.   a traveler or user of any facility of interstate commerce or common carrier; or

    f.   a patron of any public accommodation, including hotels, motels, restaurants, lunchrooms, bars, gas stations, theaters...or any other establishment which serves the public and which is principally engaged in selling food or beverages for consumption on the premises.

3) Prohibits interference by force or threat of force against any person because he/she is or has been, or in order to intimidate such person or any other person or class of persons from participating or affording others the opportunity or protection to so participate, or lawfully aiding or encouraging other persons to participate in any of the benefits or activities listed in items (1) and (2), above without discrimination as to race, color, religion, or national origin.

Punishment varies from a fine or imprisonment of up to one year, or both, and if bodily injury results or if such acts include the use, attempted use, or threatened use of a dangerous weapon, explosives, or fire shall be fined or imprisoned up to ten years or both, and if death results or if such acts include kidnapping or an attempt to kidnap, aggravated sexual abuse or an attempt to commit aggravated sexual abuse, or an attempt to kill, shall be subject to imprisonment for any term of years or for life or may be sentenced to death.

https://www.fbi.gov/investigate/civil-rights/federal-civil-rights-statutes

Plaintiff feels threatened by Eugene Volokh's document entries in the case and the contents of what he says he plans to do. Plaintiff believes he is conspiring to injure, oppress, and intimidate Plaintiff. It is oppressive for him to say that he wants to prevent Plaintiff from ever sealing the documents of the case, he wants the court to reject any of Plaintiff's future attempts to seal documents or orders of the case. Eugene Volokh also wants to hurt Plaintiff's reputation through writing. Andrew has already alerted the police to this and they said all they need is evidence of him writing about Andrew and his case like he said he would in order to charge Mr. Volokh with cyber-harassment.

**Title 18, U.S.C., Section 245 - Federally Protected Activities**

1) This statute prohibits willful injury, intimidation, or interference, or attempt to do so, by force or threat of force of any person or class of persons because of their activity as:

    a.  A voter, or person qualifying to vote...;

    b.  a participant in any benefit, service, privilege, program, facility, or activity provided or administered by the United States;

    c.  an applicant for federal employment or an employee by the federal government;

    d.  a juror or prospective juror in federal court; and

    e.  a participant in any program or activity receiving Federal financial assistance.

2) Prohibits willful injury, intimidation, or interference or attempt to do so, by force or threat of force of any person because of race, color, religion, or national origin and because of his/her activity as:

    a.  A student or applicant for admission to any public school or public college;

b.  a participant in any benefit, service, privilege, program, facility, or activity provided or administered by a state or local government;

c.  an applicant for private or state employment, private or state employee; a member or applicant for membership in any labor organization or hiring hall; or an applicant for employment through any employment agency, labor organization or hiring hall;

d.  a juror or prospective juror in state court;

e.  a traveler or user of any facility of interstate commerce or common carrier; or

f.  a patron of any public accommodation, including hotels, motels, restaurants, lunchrooms, bars, gas stations, theaters...or any other establishment which serves the public and which is principally engaged in selling food or beverages for consumption on the premises.

https://www.fbi.gov/investigate/civil-rights/federal-civil-rights-statutes

Calculated Purposeful Infliction Of Emotional Distress

What legal abuse websites such as Justia.com and legal abuse bullies such as Eugene Volokh intend to do is inflict a large amount of emotional distress on individuals. They intend on taking information that all reasonable people consider to be private and then they do everything that they can do to expose that information. Justia Incorporated is nothing more than a legal abuse business that intends on using methods of information exposure to cause emotional distress to people who look to the court for relief. Eugene Volokh as an accomplice of Justia Incorporated only intends on keeping the emotional distress going by creating another internet problem for Plaintiff to deal with by writing about this case and trying to make Plaintiff seem dumb, unintelligent, inferior, or like a silly commoner who shouldn't dare think he can use the U.S. District Court for dispute resolution without his matter being exposed to the internet. Just because most people use the internet does not mean that everything that gets on the internet is good. The internet is obviously a huge massive conduit of defamation, wrongful exposure, targeting, bullying, and a cause of emotional distress. An internet bully is almost way worse than a bully that is right in your face. The typical person is not going to intimidate Andrew in his face or beat him in a fight. So cowards like Eugene Volokh and the cowards who work at Justia Incorporated try to bully by use of the internet. They know that people are outraged and appalled every time they see that Justia Inc. has their case information, but Justia continues to undergo this course of business anyway on purpose. Internet exposure bullying can have the effect of being like a constant dark cloud over a person that they can't get rid of. Constantly having something about you on the internet that you do not want to be there can affect your ability to be happy because every time you want to enjoy something you realize that it is just fake happiness because you haven't dealt with your problem on the internet yet. Constantly having something

about someone on the internet that they don't want to be there is like slapping them in the face every time they google search themselves. Internet exposure bullying is literally high-tech, systematic, and scientific bullying. The bully intends to create a situation of despair on their target and force the person to submit to their internet posting power. Internet bullying can affect people's ability to get jobs, it can affect people's ability to build relationships, and it is so intrusive that it even intrudes into one's ability to even be able to relax and have comfort with their current status in life even in their own home. There are also physical affects from the stress caused by internet bullying. Justia Incorporated wants to keep plaintiff's information on their website and make him feel defeated. Eugene Volokh intends to continue the emotional distress on the plaintiff and create another problem for the plaintiff to contend with. The court must not enable these two bullies who intend on continuing to inflict emotional distress on Plaintiff on purpose. The case must proceed to a jury trial, and it is the plaintiff's 7th Amendment Right to a trial by jury. The documents and orders entered so far in the case must be sealed and protected from Eugene Volokh and others.

Plaintiff has a municipal court charge against Eugene Volokh. Plaintiff has made state police report complaints about Eugene Volokh. Plaintiff has made FBI complaints about Eugene Volokh. Giving Eugene Volokh access to the documents of this case would only create more problems, and give him time to destroy evidence or flee from law enforcement. Plaintiff is currently corresponding with law enforcement to fix an internet theft and exposure problem. Not allowing the sealing of the documents in this case and denying the plaintiff's motions to seal would only enable the court data theft suspects and continue to leave Plaintiff vulnerable when he is trying to defend himself from exposure. Furthermore, things that you say in a civil case when you are a victim who must prove emotional distress should not be available without being sealed because many career paths do background investigations and if any records are available without seal they may try to attain them. It is natural that employers hire at their own discretion according to their hiring biases, especially regarding commercial and corporate jobs. Also, in the legal profession firm owners and other attorneys should not be able to easily get records of things you have said in a case while under duress and trying to prove harassment and emotional distress. In a case where you are a victim and plaintiff who might need to reveal embarrassing things, you have the right to seal all of your case documents. No matter what type of wording you try to put together about the public this and the public that, this case is an issue that is to be handled in a way so that exposure is held to a minimum and so that Plaintiff is protected from defaming and slandering harmful exposure. The judge should not be vindictive and cause more harm than good. This is a case where internet exposure of the documents and testimony could have lasting harmful effects to the plaintiff's reputation, and the plaintiff filed the case with the intent to protect his reputation and fix an internet exposure, harassment, and defamation problem. Also, things being reviewed and deliberated by a jury are not allowed to be revealed to the

public. Plaintiff's documents entered are to be considered and reviewed by the jury and therefore the documents must be sealed. As Plaintiff is fighting this battle against Justia Incorporated he is also fighting a battle against individuals who indulge in data theft and internet exposure and the websites that these individuals use. Plaintiff is constantly in contact with the state police about this issue and the state police have accepted evidence given to them by Plaintiff and currently have it internally for their operations. Plaintiff must stress how important it is that the judge allow the sealing of the case documents and allow the case to proceed to trial. Plaintiff had planned to enter a jury demand for the issues of the motion to dismiss and the motion to seal. However, if Plaintiff would have entered that, Justia Inc. could have then entered a motion for a trial on all facts of the case. Plaintiff is not going to let himself be forced into a trial of everything of the case in totality before he is ready. Even though the judge had requested that Andrew file his responses by 4-16-19, rule five of the federal rules of civil procedure require that the clerk not refuse to file any paper. Part 4 of the rule says, "(4) *Acceptance by the Clerk*. The clerk must not refuse to file a paper solely because it is not in the form prescribed by these rules or by a local rule or practice." Therefore, this response must be filed accordingly.

# Federal Rules of Civil Procedure

FRCP Home » 2019 Federal Rules of Civil Procedure – Table of Contents » Title II – Commencing an Action; Service of Process; Pleadings, Motions, and Orders (Rules 3-6) » Rule 5 – Serving and Filing Pleadings and Other Papers

# Rule 5 – Serving and Filing Pleadings and Other Papers

Search …

(a) **Service: When Required**.

(1) *In General*. Unless these rules provide otherwise, each of the following papers must be served on every party:

(A) an order stating that service is required;

(B) a pleading filed after the original complaint, unless the court orders otherwise under Rule 5(c) because there are numerous defendants;

(C) a discovery paper required to be served on a party, unless the court orders otherwise;

(D) a written motion, except one that may be heard ex parte; and

(E) a written notice, appearance, demand, or offer of judgment, or any similar paper.

(2) *If a Party Fails to Appear*. No service is required on a party who is in default for failing to appear. But a pleading that asserts a new claim for relief against such a party must be served on that party under Rule 4.

⇒ **2019 Federal Rules of Civil Procedure book - Just $18.50**

2019 Federal Rules of Civil Procedure – Table of Contents

Title I – Scope of Rules; Form of Action (Rules 1 and 2)

Title II – Commencing an Action; Service of Process; Pleadings, Motions, and Orders (Rules 3-6)

Title III – Pleadings and Motions (Rules 7-16)

Title IV – Parties (Rules 17-25)

Title V – Disclosures and Discovery (Rules 26-37)

Title VI – Trials (Rules 38-53)

Title VII – Judgment (Rules 54-63)

(3) *Seizing Property*. If an action is begun by seizing property and no person is or need be named as a defendant, any service required before the filing of an appearance, answer, or claim must be made on the person who had custody or possession of the property when it was seized.

## (b) **Service: How Made**.

(1) *Serving an Attorney*. If a party is represented by an attorney, service under this rule must be made on the attorney unless the court orders service on the party.

(2) *Service in General*. A paper is served under this rule by:

  (A) handing it to the person;

  (B) leaving it:

    (i) at the person's office with a clerk or other person in charge or, if no one is in charge, in a conspicuous place in the office; or

    (ii) if the person has no office or the office is closed, at the person's dwelling or usual place of abode with someone of suitable age and discretion who resides there;

  (C) mailing it to the person's last known address—in which event service is complete upon mailing;

  (D) leaving it with the court clerk if the person has no known address;

  (E) sending it to a registered user by filing it with the court's electronic-filing system or sending it by other electronic means that the person consented to in writing—in either of which events service is complete upon filing or sending, but is not effective if the filer or

Title VIII – Provisional and Final Remedies (Rules 64-71)

Title IX – Special Proceedings (Rules 71-73)

Title X – District Courts and Clerks: Conducting Business; Issuing Orders (Rules 77-80)

Title XI – General Provisions (Rules 81-86)

Title XII – Appendix of Forms [Abrogated]

Title XIII – Supplemental Rules for Admiralty or Maritime Claims and Asset Forfeiture Actions (Rules A-G)



Purchase the print edition of the Federal Rules of Civil Procedure for $18.50.

## Other Sites:

Federal Rules of Evidence

Federal Rules of Bankruptcy Procedure

Federal Rules of Criminal Procedure

sender learns that it did not reach the person to be served; or

(F) delivering it by any other means that the person consented to in writing—in which event service is complete when the person making service delivers it to the agency designated to make delivery.

(3) *Using Court Facilities*. [Abrogated (Apr._, 2018, eff. Dec. 1, 2018)]

(c) **Serving Numerous Defendants**.

(1) *In General*. If an action involves an unusually large number of defendants, the court may, on motion or on its own, order that:

(A) defendants' pleadings and replies to them need not be served on other defendants;

(B) any crossclaim, counterclaim, avoidance, or affirmative defense in those pleadings and replies to them will be treated as denied or avoided by all other parties; and

(C) filing any such pleading and serving it on the plaintiff constitutes notice of the pleading to all parties.

(2) *Notifying Parties*. A copy of every such order must be served on the parties as the court directs.

(d) **Filing**.

(1) *Required Filings; Certificate of Service*.

(A) Papers after the Complaint. Any paper after the complaint that is required to be served—must be filed no later than a reasonable time after service. But disclosures under Rule 26(a)(1) or (2) and the following discovery requests and responses must not

Federal Rules of Appellate Procedure

US Bankruptcy Code

be filed until they are used in the proceeding or the court orders filing: depositions, interrogatories, requests for documents or tangible things or to permit entry onto land, and requests for admission.

(B) Certificate of Service. No certificate of service is required when a paper is served by filing it with the court's electronic-filing system. When a paper that is required to be served is served by other means:

   (i) if the paper is filed, a certificate of service must be filed with it or within a reasonable time after service; and

   (ii) if the paper is not filed, a certificate of service need not be filed unless filing is required by court order or by local rule.

(2) *Nonelectronic Filing.* A paper not filed electronically is filed by delivering it:

   (A) to the clerk; or

   (B) to a judge who agrees to accept it for filing, and who must then note the filing date on the paper and promptly send it to the clerk.

(3) *Electronic Filing and Signing.*

   (A) By a Represented Person—Generally Required; Exceptions. A person represented by an attorney must file electronically, unless nonelectronic filing is allowed by the court for good cause or is allowed or required by local rule.

   (B) By an Unrepresented Person—When Allowed or Required. A person not represented by an attorney:

      (i) may file electronically only if allowed by court order or by local rule; and

(ii) may be required to file electronically only by court order, or by a local rule that includes reasonable exceptions.

(C) *Signing.* A filing made through a person's electronic-filing account and authorized by that person, together with that person's name on a signature block, constitutes the person's signature.

(D) *Same as a Written Paper.* A paper filed electronically is a written paper for purposes of these rules.

(4) *Acceptance by the Clerk.* The clerk must not refuse to file a paper solely because it is not in the form prescribed by these rules or by a local rule or practice.

(As amended Jan. 21, 1963, eff. July 1, 1963; Mar. 30, 1970, eff. July 1, 1970; Apr. 29, 1980, eff. Aug. 1, 1980; Mar. 2, 1987, eff. Aug. 1, 1987; Apr. 30, 1991, eff. Dec. 1, 1991; Apr. 22, 1993, eff. Dec. 1, 1993; Apr. 23, 1996, eff. Dec. 1, 1996; Apr. 17, 2000, eff. Dec. 1, 2000; Apr. 23, 2001, eff. Dec. 1, 2001; Apr. 12, 2006, eff. Dec. 1, 2006; Apr. 30, 2007, eff. Dec. 1, 2007; Apr. 26, 2018, eff. Dec. 1, 2018.)

← Rule 4.1                Rule 5.1 →

View Advisory Committee Historical Notes

**The Long Reach of Adult Bullying**

How this kind of harassment can have harmful ripple effects on your body and mind.

**By Stacey Colino, Contributor    Dec. 15, 2017, at 9:49 a.m.**

**UNTIL THE** last presidential election and the rise of the #MeToo movement, people often thought of bullying almost exclusively as kid stuff, not something mature adults engage in. How wrong we were! It turns out that adults are being bullied at rates that rival what kids experience: In an online survey of more than 2,000 adults across the U.S., conducted on behalf of the American Osteopathic Association in October, 31 percent of respondents said they've been bullied as adults, and 43 percent believe that bullying behavior has become more accepted in the past year.

As upsetting as being bullied is at any given moment, what's worse is it can have a significant impact on your physical and emotional health, leading to sleep loss, headaches, muscle pain, anxiety and depression, or frequent sick days, according to the AOA poll. "There can be significant, long-term detrimental effects," notes Dr. Charles Sophy, an osteopathic psychiatrist in private practice and medical director for the Los Angeles County Department of Children and Family Services. Over time, "the stress from bullying can trickle into thyroid problems, gastrointestinal problems, elevated blood pressure, mood disorders, self-harming behavior and eating disorders," among other health conditions. In fact, a study in the November 2015 issue of the American Journal of Public Health found that victims of workplace bullying have double the risk of experiencing suicidal ideation over the subsequent five years.

**[Read: No, That's Not Bullying.]**

Whether it occurs at work, at the gym, sporting venues, in the community or elsewhere, bullying – defined by the American Psychological Association as "aggressive behavior in which someone intentionally and repeatedly causes another person injury or discomfort" – typically involves a real or perceived power imbalance. Among adults, bullying can take more subtle forms than it does with kids: Rather than threatening to beat someone up or calling someone nasty names, the adult brand of bullying can include political backstabbing, the silent treatment, publicly belittling or humiliating someone, social ostracism or undermining him or her.

In 2011, Tracy Lamourie and her husband experienced an onslaught of social bullying after they stood up for a lesbian couple's right to publicly display affection; the couple had been asked to leave a coffee shop in a small conservative town in Canada after a pastor complained about their kiss. The personal moment mushroomed into a community-wide controversy after the couple requested an apology from the shop's owner and didn't get one. A "Kiss In" demonstration was organized, and Lamourie, a publicist, wrote a press release that attracted local and national attention from TV stations and newspapers.

When the demonstration sparked community uproar, Lamourie and her husband became targets of bullying. "It was suddenly not only cool to hate us in person and on Facebook, but people turned on us in a giant way and it got to the point where we started to expect a rock [to be hurled] through our front window," says Lamourie, now 48. "I was depressed and angry – it was so overwhelming [that] we literally made the decision to pack up our family and walk away from the home we loved." The couple moved with their son to a Toronto suburb.

**A Climate of Fear and Loathing**

When it happens at work, being bullied also can affect your ability to focus and function effectively. "It can lead to a toxic environment where the victims are unable to concentrate because they are focused on self-preservation," says psychologist Kenneth Yeager, director of the Stress Trauma and Resilience program at The Ohio State University Wexner Medical Center in Columbus. "Bullies target people who pose a threat to them in the workplace. They will frequently target someone who is smart, competent and well-liked. After the bullying is done, the target will be less confident and may feel inadequate."

Jon Salas once worked for a manager who was a master at belittling people – "she made just about everyone in the office cry at some point, and she fostered a sense of paranoia," recalls Salas, 29, a publicist in Boston. Feeling constantly anxious and on edge, Salas often woke up at 2 a.m., "thinking about work and how I would handle my confrontation when it was my turn," he recalls. "I would fall asleep after an hour or two and wake up exhausted when my alarm went off. The effects of workplace abuse wear on you physically and emotionally."

Bullying can even have harmful ripple effects among bystanders who aren't on the receiving end because "watching it is a vicarious trauma," Sophy says. Research in a 2013 issue of the International Archives of Occupational and Environmental Health found that even witnessing workplace bullying is associated with an increased risk of developing depressive symptoms over the subsequent 18 months.

**[Read: 6 Strategies for Helping a Teen Who's Being Bullied About His or Her Weight.]**

**Coping Cues**

Since dealing with a bully can take a toll on various levels, it's smart to take care of yourself in multiple ways, too. For starters, it's important to call it what it is – to acknowledge that you're being bullied, in other words. Some people might not immediately admit they're being bullied because they're reluctant to see themselves as victims or they question their perception of what's going on. Recognizing bullying as it's happening can provide some comfort by validating your feelings and assuring you that the negative dynamic isn't imagined.

"Don't think that bullying isn't affecting you because it is unconsciously, especially if you have underlying health problems," Sophy says. You may want to see a therapist to help you cope with the fallout and get checked out by your primary care physician if you have symptoms – such as sleep problems or pain conditions – that are triggered by the stress of bullying, Sophy says. It's also important to practice good self-care – by eating well, exercising regularly, getting enough sleep and engaging in stress-relieving activities such as meditation, yoga or journal writing.

At work, try to limit your exposure to a bully, Sophy suggests. As they occur, keep an inventory of the bullying behaviors to help you develop a plan for confronting the perpetrator or formalizing a complaint if you decide to go that route. When a bully does come after you, "don't react to the attack – bullies live for the reaction," Yeager says. "It's reinforcing and enables the bully. Instead, listen carefully and respond as the voice of reason."

**[See: 7 Ways to Build Resilience for Crises and Everyday Life Challenges.]**

Between outbursts, do your best to stay focused on getting your work done and maintaining your productivity. Engage in positive self-talk to try to bolster your spirits and self-confidence – "don't give the bully free rent in your head," Yeager warns – and turn to trusted co-workers for mutual support. "We all have a part in stopping bullies, so if a peer is being bullied, be their support," Yeager advises. "If you are being bullied, find support" from co-workers. Sometimes the best way to buffer a bully's impact is to try to get by with a little help from your friends and colleagues.

You may not hear a lot about adult bullying, but it is a problem. Read this article to learn more about different types of adult bullies and get some ideas on how to deal with an adult bully. Adult bullying is a serious problem and may require legal action.

One would think that as people mature and progress through life, that they would stop behaviors of their youth. Unfortunately, this is not always the case. Sadly, adults can be bullies, just as children and teenagers can be bullies. While adults are more likely to use verbal bullying as opposed to physical bullying, the fact of the matter is that adult bullying exists. The goal of an adult bully is to gain power over another person, and make himself or herself the dominant adult. They try to humiliate victims, and "show them who is boss."

There are several different types of adult bullies, and it helps to know how they operate:

1. *Narcissistic Adult Bully*: This type of adult bully is self-centered and does not share empathy with others. Additionally, there is little anxiety about consequences. He or she seems to feel good about him or herself, but in reality has a brittle narcissism that requires putting others down.

2. *Impulsive Adult Bully*: Adult bullies in this category are more spontaneous and plan their bullying out less. Even if consequences are likely, this adult bully has a hard time restraining his or her behavior. In some cases, this type of bullying may be unintentional, resulting in periods of stress, or when the bully is actually upset or concerned about something unconnected with the victim.

3. *Physical Bully*: While adult bullying rarely turns to physical confrontation, there are, nonetheless, bullies that use physicality. In some cases, the adult bully may not actually physically harm the victim, but may use the threat of harm, or physical domination through looming. Additionally, a physical bully may damage or steal a victim's property, rather than physically confronting the victim.

4. *Verbal Adult Bully*: Words can be quite damaging. Adult bullies who use this type of tactic may start rumors about the victim, or use sarcastic or demeaning language to dominate or humiliate another person. This subtle type of bullying also has the advantage – to the bully – of being difficult to document. However, the emotional and psychological impacts of verbal bullying can be felt quite keenly and can result in reduced job performance and even depression.

5. *Secondary Adult Bully*: This is someone who does not initiate the bullying, but joins in so that he or she does not actually become a victim down the road. Secondary bullies may feel bad about what they are doing, but are more concerned about protecting themselves.

Workplace bullying can make life quite miserable and difficult. Supervisors should be made aware of adult bullies, since they can disrupt productivity, create a hostile work environment (opening the company to the risk of a law suit) and reduce morale.

It is important to note, though, that there is little you can do about an adult bully, other than ignore and try to avoid, after reporting the abuse to a supervisor. This is because adult bullies are

often in a set pattern. They are not interested in working things out and they are not interested in compromise. Rather, adult bullies are more interested in power and domination. They want to feel as though they are important and preferred, and they accomplish this by bringing others down. There is very little you can do to change an adult bully, beyond working within the confines of laws and company regulations that are set up. The good news is that, if you can document the bullying, there are legal and civil remedies for harassment, abuse and other forms of bullying. But you have to be able to document the case.

Adult bullies were often either bullies as children, or bullied as children. Understanding this about them may be able to help you cope with the behavior. But there is little you can do about it beyond doing your best to ignore the bully, report his or her behavior to the proper authorities, and document the instances of bullying so that you can take legal action down the road if necessary.

http://www.bullyingstatistics.org/content/adult-bullying.html

Bullying harassment may include verbal bullying, cyber bullying, text bullying, etc…and may occur as part of workplace harassment, or school bullying. This article helps define bullying harassment and offers tips on dealing with bullying harassment. Help stop bullying now.

One of the issues that many of us deal with while growing up is bullying harassment. Bullying harassment is common, but that does not mean that it should be acceptable. It is a good idea to teach your children ways to avoid bullies, and also to teach them to treat others with respect. Indeed, it is possible for some who have been harassed to become bullies themselves in some situations.

## What is bullying harassment?

A bully is someone who is overbearing or cruel. The aim of bullying is to cause embarrassment and humiliation in the subject. Often, a bully is someone who is bigger or stronger in some way, and who harasses those who are smaller or weaker. Harassment is systematically bothering someone to the point where the environment becomes dangerous in some way. Bullying harassment is aimed at intimidation, and a desire to dominate for some reason.

It is important to note that bullying is not just physical behavior. While many people think of bullying in terms of physical harm and danger, this is not the only type of bullying harassment out there. It is also possible to bully people emotionally, verbally or electronically – without ever laying a finger on the victims. It is important to note that non-physical forms of bullying harassment can be just as traumatizing as physical bullying. Indeed, physical signs of bullying often disappear long before the psychological effects of emotional, verbal or electronic bullying disappear.

Even in its non-physical forms, bullying harassment is meant to intimidate and terrorize the victim. Saying rude and hurtful things habitually, turning friends, classmates and co-workers against someone, or harassing someone online or via text message, are all forms of bullying. These types of bullying can lead to ostracizing the victim, as well as inflicting emotional damage. The idea is to raise oneself up by tearing someone down and ruining his or her reputation. This can drive victims into depression, anti-social behavior and even substance abuse.

## Dealing with bullying harassment

It can be difficult to deal with bullying harassment. However, since bullying is a behavior aimed at choosing someone who appears weak and then intimidating him or her further, there are some techniques that can help stave off bullies:

- Showing good posture indicates confidence, and may reduce someone's likelihood of being a target.

- Making eye contact can also communicate that you are not vulnerable.

- Avoid isolated areas. Try to stay in public areas, where there are likely to be witnesses – especially authority figures – to the bullying behavior.

- Keep friends around. Many bullies are not interested in picking on someone who has a support system. Try to go places with friends, so that you are not alone.

- Runaway. This can be difficult, especially for children. However, it is better to leave the situation than to comply with a bully's demands.

- Tell an authority figure. Children should be taught to notify authority figures of bullying behavior. This can be a good move, since it will bring the bully to the attention of those who can keep an eye on things.

You will need to show that you are willing to listen to your child, and that you will take him or her seriously. Try not to judge, and teach your child tactics to help him or her avoid becoming a target. If he or she is a target, let someone (teachers, etc.) know about the problem. You can try to approach the parents of the bully, but they might not be willing to hear the truth. It is important, though, that your attempts to talk to a bully's parents do not end up in conflict.

In the end, the best thing to do is to work with other parents and teachers to help show those in the school that bullying is not something that will be tolerated. This can nip the problem in the bud, as long as everyone makes an effort to stop bullying.

http://www.bullyingstatistics.org/content/bullying-harassment.html



# Long-term effects of bullying

Dieter Wolke,[1] Suzet Tanya Lereya[2]



**OPEN ACCESS**

[1]Department of Psychology and Division of Mental Health and Wellbeing, University of Warwick, Coventry, UK
[2]Department of Psychology, University of Warwick, Coventry, UK

**Correspondence to**
Professor Dieter Wolke, Department of Psychology, University of Warwick, Coventry, CV4 7AL, UK; D.Wolke@warwick.ac.uk

Received 25 November 2014
Revised 6 January 2015
Accepted 18 January 2015
Published Online First 10 February 2015

## ABSTRACT
Bullying is the systematic abuse of power and is defined as aggressive behaviour or intentional harm-doing by peers that is carried out repeatedly and involves an imbalance of power. Being bullied is still often wrongly considered as a 'normal rite of passage'. This review considers the importance of bullying as a major risk factor for poor physical and mental health and reduced adaptation to adult roles including forming lasting relationships, integrating into work and being economically independent. Bullying by peers has been mostly ignored by health professionals but should be considered as a significant risk factor and safeguarding issue.

## DEFINITION AND EPIDEMIOLOGY
Bullying is the systematic abuse of power and is defined as aggressive behaviour or *intentional harm-doing* by peers that is carried out *repeatedly* and involves *an imbalance of power*, either actual or perceived, between the victim and the bully.[1] Bullying can take the form of direct bullying, which includes physical and verbal acts of aggression such as hitting, stealing or name calling, or indirect bullying, which is characterised by social exclusion (eg, you cannot play with us, you are not invited, etc) and rumour spreading.[2–4] Children can be involved in bullying as victims and bullies, and also as bully/victims, a subgroup of victims who also display bullying behaviour.[5 6] Recently there has been much interest in cyberbullying, which can be broadly defined as any bullying which is performed via electronic means, such as mobile phones or the internet. One in three children report having been bullied at some point in their lives, and 10–14% experience chronic bullying lasting for more than 6 months.[7 8] Between 2% and 5% are bullies and a similar number are bully/victims in childhood/adolescence.[9] Rates of cyberbullying are substantially lower at around 4.5% for victims and 2.8% for perpetrators (bullies and bully/victims), with up to 90% of the cyber-bullying victims also being traditionally (face to face) bullied.[10] Being bullied by peers is the most frequent form of abuse encountered by children, much higher than abuse by parents or other adult perpetrators[11] (box 1).

## BULLYING IS NOT CONDUCT DISORDER
Bullying is found in all societies, including modern hunter-gatherer societies and ancient civilisations. It is considered an evolutionary adaptation, the purpose of which is to gain high status and dominance,[14] get access to resources, secure survival, reduce stress and allow for more mating opportunities.[15] Bullies are often bi-strategic, employing both bullying and also acts of aggressive 'prosocial' behaviour to enhance their own position by acting in public and making the recipient dependent as they cannot reciprocate.[16] Thus, pure bullies (but not bully/victims or victims) have been found to be strong, highly popular and to have good social and emotional understanding.[17] Hence, bullies most likely do not have a conduct disorder. Moreover, unlike conduct disorder, bullies are found in all socioeconomic[18] and ethnic groups.[12] In contrast, victims have been described as withdrawn, unassertive, easily emotionally upset, and as having poor emotional or social understanding,[17 19] while bully/victims tend to be aggressive, easily angered, low on popularity, frequently bullied by their siblings[20] and come from families with lower socioeconomic status (SES),[18] similar to children with conduct disorder.

## HOW BULLIES OPERATE
Bullying occurs in settings where individuals do not have a say concerning the group they want to be in. This is the situation for children in school classrooms or at home with siblings, and has been compared to being 'caged' with others. In an effort to establish a social network or hierarchy, bullies will try to exert their power with all children. Those who have an emotional reaction (eg, cry, run away, are upset) and have nobody or few to stand up for them, are the repeated targets of bullies. Bullies may get others to join in (laugh, tease, hit, spread rumours) as bystanders or even as henchmen (bully/victims). It has been shown that conditions that foster higher density and greater hierarchies in classrooms (inegalitarian conditions),[21] at home[22] or even in nations,[23] increase bullying[24] and the stability of bullying victimisation over time.[25]

## ADVERSE CONSEQUENCES OF BEING BULLIED
Until fairly recently, most studies on the effects of bullying were cross-sectional or just included brief follow-up periods, making it impossible to identify whether bullying is the cause or consequence of health problems. Thus, this review focuses mostly on prospective studies that were able to control for pre-existing health conditions, family situation and other exposures to violence (eg, family violence) in investigating the effects of being involved in bullying on subsequent health, self-harm and suicide, schooling, employment and social relationships.

## CHILDHOOD AND ADOLESCENCE (6–17 YEARS)
A fully referenced summary of the consequences of bullying during childhood and adolescence on prospectively studied outcomes up to the age of 17 years is shown in table 1. Children who were victims of bullying have been consistently found to be at higher risk for common somatic problems such as colds, or psychosomatic problems such as



Open Access
Scan to access more free content

CrossMark

**To cite:** Wolke D, Lereya ST. *Arch Dis Child* 2015;**100**:879–885.

**Review**

**Box 1   Bullying screener**

A. *Direct bullying* refers to harming others by directly getting at them. It is done by one or a group of pupils repeatedly against some children at school. These children:
   ▶ Are threatened or blackmailed or have their things stolen
   ▶ Are insulted or get called nasty names
   ▶ Have nasty tricks played on them/are subject to ridicule
   ▶ Are hit, shoved around or beaten up

B. *Relational bullying* refers to damage relationships between friends and destroy status in groups to hurt or upset someone. Over and over again some children at school:
   ▶ Get deliberately left out of get-togethers, parties, trips or groups
   ▶ Have others ignore them, not wanting to be their friend anymore, or not wanting them around in their group
   ▶ Have nasty lies, rumours or stories told about them

C. *Cyberbullying* is when someone tries to upset and harm a person using electronic means (eg, mobile phones, text messages, instant messaging, blogs, websites (eg, Facebook, YouTube) or emails)
   ▶ Have their private email, instant mail or text messages forwarded to someone else or have them posted where others can see them
   ▶ Have rumours spread about them online
   ▶ Get threatening or aggressive emails, instant messages or text messages
   ▶ Have embarrassing pictures posted online without their permission

(Answered for A, B, and C separately on this 4-point scale)
1. How often have these things happened to you in the last 6 months?
   Never
   Not much (1–3 times)
   Quite a lot (more than 4 times)
   A lot (at least once a week)
2. How often have you done these things to others in the last 6 months?
   Never
   Not much (1–3 times)
   Quite a lot (more than 4 times)
   A lot (at least once a week)
*Victims*: Happened to them: quite a lot/a lot; did to others: never/not much
*Bully/victims*: Happened to them: quite a lot/a lot; did to others: quite a lot/a lot
*Bullies*: Happened to them: never/not much; did to others: quite a lot/a lot
Adapted from refs [3 8 12 13]

headaches, stomach aches or sleeping problems, and are more likely to take up smoking.[39 40] Victims have also been reported to more often develop internalising problems and anxiety disorder or depression disorder.[31] Genetically sensitive designs allowed comparison of monozygotic twins who are genetically identical and live in the same households but were discordant for experiences of bullying. Internalising problems was found to have increased over time only in those who were bullied,[32] providing strong evidence that bullying rather than other factors explains increases in internalising problems. Furthermore, victims of bullying are at significantly increased risk of self-harm

or thinking about suicide in adolescence.[43 44] Furthermore, being bullied in primary school has been found to both predict borderline personality symptoms[30] and psychotic experiences, such as hallucinations or delusions, by adolescence.[37] Where investigated, those who were either exposed to several forms of bullying or were bullied over long periods of time (chronic bullying) tended to show more adverse effects.[31 37] In contrast to the consistently moderate to strong relationships with somatic and mental health outcomes, the association between being bullied and poor academic functioning has not been as strong as expected.[51] A meta-analysis only indicated a small negative effect of victimisation on mostly concurrent academic performance and the effects differed whether bullying was self-reported or by peers or teachers.[47] Those studies that distinguished between victims and bully/victims usually reported that bully/victims had a slightly higher risk for somatic and mental health problems than pure victims.[41 52] Furthermore, most studies considered bullies and bully/victims together; however, as outlined above, the two roles are quite different with bullies often highly competent manipulators and ringleaders, while bully/victims are described as impulsive and poor in regulating their emotions.[53] We know little about the mental health outcomes of bullies in childhood, but there are some suggestions that they may also be at slightly increased risk of depression or self-harm,[33 45] however, less so than victims. Similarly, the relationship between being a bully and somatic health is weaker than in bully/victims,[39] or bullies have even been found to be healthier and stronger than children not involved in bullying.[41] Bullying perpetration has been found to increase the risk of offending in adolescence;[54] however, the analysis did not distinguish between bullies and bully/victims and did not include information about poly-victimisation (eg, being maltreated by parents). Bullies were also more likely to display delinquent behaviour and perpetrate dating violence by eighth grade.[50]

## CHILDHOOD TO ADULTHOOD (18–50 YEARS)

Children who were victims of bullying have been consistently found to be at higher risk for internalising problems, in particular diagnoses of anxiety disorder[55] and depression[9] in young adulthood and middle adulthood (18–50 years of age) (table 2).[56] Furthermore, victims were at increased risk for displaying psychotic experiences at age 18[8] and having suicidal ideation, attempts and completed suicides.[56] Victims were also reported to have poor general health,[65] including more bodily pain, headaches and slower recovery from illnesses.[57] Moreover, victimised children were found to have lower educational qualifications, be worse at financial management[57] and to earn less than their peers even at age 50.[56 69] Victims were also reported to have more trouble making or keeping friends and to be less likely to live with a partner and have social support. No association between substance use, anti-social behaviour and victimisation was found. The studies that distinguished between victims and bully/victims showed that usually bully/victims had a slightly higher risk for anxiety, depression, psychotic experiences, suicide attempts and poor general health than pure victims.[9] They also had even lower educational qualifications and trouble keeping a job and honouring financial obligations.[57 65] In contrast to pure victims, bully/victims were at increased risk for displaying anti-social behaviour and were more likely to become a young parent.[62 70 71] Again, we know less about pure bullies, but where studied, they were not found to be at increased risk for any mental or general health problems. Indeed, they were healthier than their peers, emotionally and physically.[9 57] However, pure bullies may be more deviant and more likely to

**Table 1** Consequences of involvement in bullying behaviour in childhood and adolescence on outcomes assessed up to 17 years of age

| Outcome | Findings | | | Example references |
|---|---|---|---|---|
| | Victims | Bullies | Bully/victims | |
| **Health and mental health** | | | | |
| Anti-social personality disorder | No significant association was found between victims and delinquent behaviour. | Bullying perpetration was strongly linked to delinquent behaviour. | Bullying victimisation was associated with delinquent behaviour. | 26 |
| Anxiety | Pre-school peer victimisation increases the risk of anxiety disorders in first grade. Peer victimisation (especially relational victimisation) was strongly related to adolescents' social anxiety. Moreover, peer victimisation was both a predictor and a consequence of social anxiety over time. However, Storch and colleagues' results showed that overt victimisation was not a significant predictor of social anxiety or phobia and relational victimisation only predicted symptoms of social phobia. | — | — | 27–29 |
| Borderline personality symptoms (BPD) | Victims showed an increased risk of developing BPD symptoms. Moreover, a dose-response effect was found: stronger associations were identified with increased frequency and severity of being bullied. | — | — | 30 |
| Depression and internalising problems | Monozygotic twins who had been bullied had more internalising symptoms compared with their co-twin who had not been bullied. Peer victimisation was associated with higher overall scores, as well as increased odds of scoring in the severe range for emotional and depression symptoms. Victims were also more likely to show persistent depression symptoms over a 2-year period. Moreover, a dose-response relationship was found showing that the stability of victimisation and experiencing both direct and indirect victimisation conferred a higher risk for depression problems and depressive symptom persistence. A meta-analytic study showed significant associations between peer victimisation and subsequent changes in internalising problems, as well as significant associations between internalising problems and subsequent changes in peer victimisation. | Being a bully was not a predictor of subsequent depression among girls but was among boys. | Bully/victims exhibited significantly greater internalising problems. | 31–36 |
| Psychotic experiences | Being bullied increased the risk of psychotic experiences. Also a dose-response relationship was found where stronger associations were identified with increased frequency, severity and duration of being bullied. | — | — | 37, 38 |
| Somatic problems | Children and adolescents who are bullied have a higher risk for psychosomatic problems such as headache, stomach ache, backache, sleeping difficulties, tiredness and dizziness. They were also more likely to display sleep problems such as nightmares and night-terrors. | Pure bullies had the least physical or psychosomatic health problems. | Bully/victims displayed the highest levels of physical or psychosomatic health problems. | 39–42 |
| Self-harm and suicidality | Those who are bullied were at increased risk for self-harming, suicidal ideation and/or behaviours in adolescence. Moreover, a dose-response relationship was found showing that those who were chronically bullied had a higher risk of suicidal ideation and/or behaviours in adolescence. Lastly, cyberbullying victimisation was not associated with suicidal ideation. | Pure bullies had increased risk of suicidal ideation and suicidal/self-harm behaviour according to child reports of bullying involvement. | Bully/victims were at increased risk for suicidal ideation and suicidal/self-harm behaviour. | 26, 43–46 |
| **Academic achievement** | | | | |
| Academic achievement, absenteeism and school adjustment | A significant association was found between peer victimisation, poorer academic functioning and absenteeism only in fifth grade. Frequent victimisation by peers was associated with poor academic functioning (as indicated by grade point averages and achievement test scores) on both a concurrent and a predictive level. Pure victims also showed poor school adjustment and reported a more negative perceived school climate compared to bullies and uninvolved youth. | Pure bullies showed poor school adjustment. | Bully/victims showed poor school adjustment and reported a more negative perceived school climate compared to bullies and uninvolved youth. | 47–49 |
| **Social relationships** | | | | |
| Dating | — | Direct bullying, in sixth grade, predicted the onset of physical dating violence perpetration by eighth grade. | — | 50 |

Review

Table 2   Consequences of involvement in bullying behaviour in childhood/adolescence on outcomes in young adulthood and adulthood (18–50 years)

| Categories | Findings | | | Example References |
|---|---|---|---|---|
| | Victims | Bullies | Bully/victims | |
| **Health and mental health** | | | | |
| Anti-social personality disorder | No significant relationship was found between victimisation and anti-social behaviour. | Being a bully increased the risk of violent, property and traffic offences, delinquency, aggressiveness, impulsivity, psychopathy, contact with police or courts and serious criminal charges in young adulthood. | Frequent bully/victim status predicted anti-social personality disorder. Bully/victims also had higher rates of serious criminal charges and broke into homes, businesses and property in young adulthood. | 9 57–61 |
| Anxiety | Victimised adolescents (especially pure victims) displayed a higher prevalence of agoraphobia, generalised anxiety and panic disorder in young adulthood. | No significant relationship was found between being a pure bully and anxiety problems. | Bully/victims displayed higher levels of panic disorder and agoraphobia (females only) in young adulthood. Frequent bully/victim status predicted anxiety disorder. | 55 56 59 62 |
| Depression and internalising problems | All types of frequent victimisation increased the risk of depression and internalising problems. Experiencing more types of victimisation was related to higher risk for depression. On the other hand, Copeland and colleagues did not find a significant association between pure victim status and depression. | No significant association between pure bully status and depression was found. | Bully/victims were at increased risk of young adult depression. | 9 55 56 59 63 |
| Inflammation | Being a pure victim in childhood/adolescence predicted higher levels of C-reactive protein (CRP). | Being a pure bully in childhood/adolescence predicted lower levels of CRP. | The CRP level of bully/victims did not differ from that of those uninvolved in bullying. | 64 |
| Psychotic experiences | Pure victims had a higher prevalence of psychotic experiences at age 18 years. | No significant association was found between pure bully status and psychotic experiences. | Bully/victims were at increased risk for psychotic experiences at age 18 years. | 8 |
| Somatic problems | Those who were victimised were more likely to have bodily pain and headache. Frequent victimisation in childhood was associated with poor general health at ages 23 and 50. Moreover, pure victims reported slow recovery from illness in young adulthood. | No significant association was found between health and pure bully status. | Bully/victims were more likely to have poor general health and bodily pain and develop serious illness in young adulthood. They also reported poorer health status and slow recovery from illness. | 56 57 65 |
| Substance use | No significant relationship was found between victimisation and drug use, but being frequently victimised predicted daily heavy smoking. | Bullies were more likely to use illicit drugs and tobacco and to get drunk. | Bully/victim status did not significantly predict substance use but bully/victims were more likely to use tobacco. | 57 59 65 66 |
| Suicidality/self-harm | Results were mixed regarding suicidality and victimisation status. Some showed that all types of frequent victimisation increased the risk of suicidal ideation and attempts. Experiencing many types of victimisation was related to a higher risk for suicidality. However, others only found an association between suicidality and frequent victimisation among girls. | No significant association was found between being a bully and future suicidality. | Male bully/victims were at increased risk for suicidality in young adulthood. | 9 56 67 68 |
| **Wealth** | | | | |
| Academic achievement | Generally, victims had lower educational qualifications and earnings into adulthood. | Bullies were more likely to have lower educational qualifications. | Bully/victims were more likely to have a lower education. | 56 65 69 |
| Employment | Some found no significant association between occupation status and victimisation, whereas others showed that frequent victimisation was associated with poor financial management and trouble with keeping a stable job, being unemployed and earning less than peers. | Bullies were more likely to have trouble keeping a job and honouring financial obligations. They were more likely to be unemployed. | Bully/victims had trouble with keeping a job and honouring financial obligations. | 59 57 |
| **Social relationships** | | | | |
| Peer relationships | Frequently victimised children had trouble making or keeping friends and were less likely to meet up with friends at age 50. | Pure bullies had trouble making or keeping friends. | Bully/victims were at increased risk for not having a best friend and had trouble with making or keeping friends. | 56 57 |
| Partnership | Being a victim of bullying in childhood was not associated with becoming a young parent. Frequent victimisation increased the risk of living without a spouse or partner and receiving less social support at age 50. | When bully/victims were separated from bullies, pure bully status did not have a significant association with becoming a young father (under the age of 22). However, pure bullies were more likely to become young mothers (under the age of 20). No significant association between bully status and cohabitation status was found. | Being a bully/victim in childhood increased the likelihood of becoming a young parent. No significant association between bully/victim and cohabitation status was found. | 65 70 71 |



**Figure 1**   The impact of being bullied on functioning in teenagers and adulthood.

be less educated and to be unemployed.[65] They have also been reported to be more likely to display anti-social behaviour, and be charged with serious crime, burglary or illegal drug use.[58 59 66] However, many of these effects on delinquency may disappear when other adverse family circumstances are controlled for.[57]

The findings from prospective child, adolescent and adult outcome studies are summarised in figure 1.

The carefully controlled prospective studies reviewed here provide a converging picture of the long-term effects of being bullied in childhood. First, the effects of being bullied extend beyond the consequences of other childhood adversity and adult abuse.[9] In fact, when compared to the experience of having been placed into care in childhood, the effects of frequent bullying were as detrimental 40 years later.[61] Second, there is a dose–effect relationship between being victimised by peers and outcomes in adolescence and adulthood. Those who were bullied more frequently,[56] more severely (ie, directly and indirectly)[31] or more chronically (ie, over a longer period of time[8]) have worse outcomes. Third, even those who stopped being bullied during school age showed some lingering effects on their health, self-worth and quality of life years later compared to those never bullied[72] but significantly less than those who remained victims for years (chronic victims). Fourth, where victims and bully/victims have been considered separately, bully/victims seem to show the poorest outcomes concerning mental health, economic adaptation, social relationships and early parenthood.[8 9 62 70] Lastly, studies that distinguished between bullies and bully/victims found few adverse effects of being a pure bully on adult outcomes. This is consistent with a view that bullies are highly sophisticated social manipulators who are callous and show little empathy.[73]

## PROCESSES

There are a variety of potential routes by which being victimised may affect later life outcomes. Being bullied may affect physiological responses to stress,[74] interact with a genetic vulnerability such as variation in the serotonin transporter (5-HTT) gene,[75] or affect telomere length (ageing) or the epigenome.[76] Altered HPA-axis activity and altered cortisol responses may increase the risk for developing mental health problems[77] and also increase susceptibility to illness by interfering with immune responses.[78] In contrast, bullying may also differentially affect normal chronic inflammation and associated health problems that can persist into adulthood.[64] Chronically raised C-reactive protein (CRP) levels, a marker of low-grade systemic

inflammation in the body, increase the risk of cardiovascular diseases, metabolic disorders and mental health problems such as depression.[79] Blood tests revealed that CRP levels in the blood of bullied children increased with the number of times they were bullied. Additional blood tests carried out on the children after they had reached 19 and 21 years of age revealed that those who were bullied as children had CRP levels more than twice as high as bullies, while bullies had CRP levels lower than those who were neither bullies nor victims (figure 2). Thus, bullying others appears to have a protective effect consistent with studies showing lower inflammation for individuals with higher socioeconomic status[80] and studies with non-human primates showing health benefits for those higher in the social hierarchy.[81] The clear implication of these findings is that both ends of the continuum of social status in peer relationships are important for inflammation levels and health status.

Furthermore, experiences of threat by peers may alter cognitive responses to threatening situations.[82] Both altered stress responses and altered social cognition (eg, being hypervigilant to hostile cues[38]) and neurocircuitry[83] related to bullying exposure may affect social relationships with parents, friends and co-workers. Finally, victimisation, in particular of bully/victims, affects schooling and has been found to be associated with school absenteeism. In the UK alone, over 16 000 young people



**Figure 2**   Adjusted mean young adult C-reactive protein (CRP) levels (mg/L) based on childhood/adolescent bullying status. These values are adjusted for baseline CRP levels as well as other CRP-related covariates. All analyses used robust SEs to account for repeated observations (reproduced from Copeland et al[84]).

**Review**

aged 11–15 are estimated to be absent from state school with bullying as the main reason, and 78 000 are absent where bullying is one of the reasons given for absence.[84] The risk of failure to complete high school or college in chronic victims or bully/victims increases the risk of poorer income and job performance.[57]

## SUMMARY AND IMPLICATIONS

Childhood bullying has serious effects on health, resulting in substantial costs for individuals, their families and society at large. In the USA, it has been estimated that preventing high school bullying results in lifetime cost benefits of over $1.4 million per individual.[85] In the UK alone, over 16 000 young people aged 11–15 are estimated to be absent from state school with bullying as the main reason, and 78 000 are absent where bullying is one of the reasons given for absence.[86] Many bullied children suffer in silence, and are reluctant to tell their parents or teachers about their experiences, for fear of reprisals or because of shame.[87] Up to 50% of children say they would rarely, or never, tell their parents, while between 35% and 60% would not tell their teacher.[11]

Considering this evidence of the ill effects of being bullied and the fact that children will have spent much more time with their peers than their parents by the time they reach 18 years of age, it is more than surprising that childhood bullying is not at the forefront as a major public health concern.[88] Children are hardly ever asked about their peer relationships by health professionals. This may be because health professionals are poorly educated about bullying and find it difficult to raise the subject or deal with it.[89] However, it is important considering that many children abstain from school due to bullying and related health problems and being bullied throws a long shadow over their lives. To prevent violence against the self (eg, self-harm) and reduce mental and somatic health problems, it is imperative for health practitioners to address bullying.

**Contributors** DW conceived the review, produced the first draft and revised it critically; STL contributed to the literature research and writing, and critically reviewed and approved the final version of the manuscript.

**Funding** This review was partly supported by the Economic and Social Research Council (ESRC) grant ES/K003593/1.

**Competing interests** None.

**Provenance and peer review** Commissioned; externally peer reviewed.

**Open Access** This is an Open Access article distributed in accordance with the Creative Commons Attribution Non Commercial (CC BY-NC 4.0) license, which permits others to distribute, remix, adapt, build upon this work non-commercially, and license their derivative works on different terms, provided the original work is properly cited and the use is non-commercial. See: http://creativecommons.org/licenses/by-nc/4.0/

## REFERENCES

1  Olweus D. *Bullying at school: What we know and what we can do*. Wiley-Blackwell, 1993.
2  Bjorkqvist K, Lagerspetz KM, Kaukiainen A. Do girls manipulate and boys fight? Developmental trends in regard to direct and indirect aggression. *Aggress Behav* 1992;18:117–27.
3  Wolke D, Woods S, Bloomfield L, *et al*. The association between direct and relational bullying and behaviour problems among primary school children. *J Child Psychol Psychiatry* 2000;41:989–1002.
4  Crick NR, Grotpeter JK. Children's treatment by peers: Victims of relational and overt aggression. *Dev Psychopathol* 1996;8:367–80.
5  Haynie DL, Nansel T, Eitel P, *et al*. Bullies, victims, and bully/victims: Distinct groups of at-risk youth. *J Early Adolesc* 2001;21:29–49.
6  Boulton MJ, Smith PK. Bully/victim problems in middle-school children: Stability, self-perceived competence, peer perceptions and peer acceptance. *Br J Dev Psychol* 1994;12:315–29.
7  World Health Organization. Risk behaviours: being bullied and bullying others. In: Currie C, Zanotti C, Morgan A, *et al*, eds. *Social determinants of health and*

well-being among young people. *Health Behaviour in School-aged Children (HBSC) study: International report from the 2009/2010 survey*. Copenhagen: WHO Regional Office for Europe, 2012:191–200.
8  Wolke D, Lereya ST, Fisher HL, *et al*. Bullying in elementary school and psychotic experiences at 18 years: a longitudinal, population-based cohort study. *Psychol Med* 2014;44:2199–211.
9  Copeland WE, Wolke D, Angold A, *et al*. Adult psychiatric outcomes of bullying and being bullied by peers in childhood and adolescence. *JAMA Psychiatry* 2013;70:419–26.
10  Olweus D. Cyberbullying: An overrated phenomenon? *Eur J Dev Psychol* 2012;9:520–38.
11  Radford L, Corral S, Bradley C, *et al*. The prevalence and impact of child maltreatment and other types of victimization in the UK: Findings from a population survey of caregivers, children and young people and young adults. *Child Abuse Negl* 2013;37:801–13.
12  Tippett N, Wolke D, Platt L. Ethnicity and bullying involvement in a national UK youth sample. *J Adolesc* 2013;36:639–49.
13  Wolke D, Woods S, Stanford K, *et al*. Bullying and victimization of primary school children in England and Germany: Prevalence and school factors. *Br J Psychol* 2001;92:673–96.
14  Olthof T, Goossens FA, Vermande MM, *et al*. Bullying as strategic behavior: Relations with desired and acquired dominance in the peer group. *J Sch Psychol* 2011;49:339–59.
15  Volk AA, Camilleri JA, Dane AV, *et al*. Is adolescent bullying an evolutionary adaptation? *Aggress Behav* 2012;38:222–38.
16  Hawley PH, Little TD, Card NA. The myth of the alpha male: a new look at dominance-related beliefs and behaviors among adolescent males and females. *Int J Behav Dev* 2008;32:76–88.
17  Woods S, Wolke D, Novicki S, *et al*. Emotion recognition abilities and empathy of victims of bullying. *Child Abuse Negl* 2009;33:307–11.
18  Tippett N, Wolke D. Socioeconomic status and bullying: a meta-analysis. *Am J Public Health* 2014;104:e48–e59.
19  Camodeca M, Goossens FA, Schuengel C, *et al*. Links between social informative processing in middle childhood and involvement in bullying. *Aggress Behav* 2003;29:116–27.
20  Wolke D, Skew A. Family factors, bullying victimisation and wellbeing in adolescents. *Longit Life Course Stud* 2012;3:101–19.
21  Garandeau C, Lee I, Salmivalli C. Inequality matters: classroom status hierarchy and adolescents' bullying. *J Youth Adolesc* 2014;43:1123–33.
22  Wolke D, Skew AJ. Bullying among siblings. *Int J Adolesc Med Health* 2012;24:17–25.
23  Elgar FJ, Craig W, Boyce W, *et al*. Income inequality and school bullying: multilevel study of adolescents in 37 countries. *J Adolesc Health* 2009;45:351–9.
24  Ahn HJ, Garandeau CF, Rodkin PC. Effects of classroom embeddedness and density on the social status of aggressive and victimized children. *J Early Adolesc* 2010;30:76–101.
25  Schafer M, Korn S, Brodbeck FC, *et al*. Bullying roles in changing contexts: the stability of victim and bully roles from primary to secondary school. *Int J Behav Dev* 2005;29:323–35.
26  Barker ED, Arseneault L, Brendgen M, *et al*. Joint development of bullying and victimization in adolescence: relations to delinquency and self-harm. *J Am Acad Child Adolesc Psychiatry* 2008;47:1030–8.
27  Wichstrøm L, Belsky J, Berg-Nielsen TS. Preschool predictors of childhood anxiety disorders: a prospective community study. *J Child Psychol Psychiatry* 2013;54:1327–36.
28  Siegel R, La Greca A, Harrison H. Peer victimization and social anxiety in adolescents: prospective and reciprocal relationships. *J Youth Adolesc* 2009;38:1096–109.
29  Storch EA, Masia-Warner C, Crisp H, *et al*. Peer victimization and social anxiety in adolescence: a prospective study. *Aggress Behav* 2005;31:437–52.
30  Wolke D, Schreier A, Zanarini MC, *et al*. Bullied by peers in childhood and borderline personality symptoms at 11 years of age: a prospective study. *J Child Psychol Psychiatry* 2012;53:846–55.
31  Zwierzynska K, Wolke D, Lereya TS. Peer victimization in childhood and internalizing problems in adolescence: a prospective longitudinal study. *J Abnorm Child Psychol* 2013;41:309–23.
32  Arseneault L, Milne BJ, Taylor A, *et al*. Being bullied as an environmentally mediated contributing factor to children's internalizing problems: a study of twins discordant for victimization. *Arch Pediatr Adolesc Med* 2008;162:145–50.
33  Kaltiala-Heino R, Fröjd S, Marttunen M. Involvement in bullying and depression in a 2-year follow-up in middle adolescence. *Eur Child Adolesc Psychiatry* 2010;19:45–55.
34  Kumpulainen K, Rasanen E. Children involved in bullying at elementary school age: their psychiatric symptoms and deviance in adolescence. An epidemiological sample. *Child Abuse Negl* 2000;24:1567–77.
35  Sweeting H, Young R, West P, *et al*. Peer victimization and depression in early–mid adolescence: a longitudinal study. *Br J Educ Psychol* 2006;76:577–94.
36  Reijntjes A, Kamphuis JH, Prinzie P, *et al*. Peer victimization and internalizing problems in children: a meta-analysis of longitudinal studies. *Child Abuse Negl* 2010;34:244–52.

37  Schreier A, Wolke D, Thomas K, et al. Prospective study of peer victimization in childhood and psychotic symptoms in a nonclinical population at age 12 years. Arch Gen Psychiatry 2009;66:527–36.

38  van Dam DS, van der Ven E, Velthorst E, et al. Childhood bullying and the association with psychosis in non-clinical and clinical samples: a review and meta-analysis. Psychol Med 2012;42:2463–74.

39  Gini G, Pozzoli T. Association between bullying and psychosomatic problems: a meta-analysis. Pediatrics 2009;123:1059–65.

40  Wolke D, Lereya ST. Bullying and parasomnias: a longitudinal cohort study. Pediatrics 2014;134:e1040–8.

41  Wolke D, Woods S, Bloomfield L, et al. Bullying involvement in primary school and common health problems. Arch Dis Child 2001;85:197–201.

42  Gini G, Pozzoli T. Bullied children and psychosomatic problems: a meta-analysis. Pediatrics 2013;132:720–9.

43  Lereya ST, Winsper C, Heron J, et al. Being bullied during childhood and the prospective pathways to self-harm in late adolescence. J Am Acad Child Adolesc Psychiatry 2013;52:608–18.e2.

44  Fisher HL, Moffitt TE, Houts RM, et al. Bullying victimisation and risk of self harm in early adolescence: longitudinal cohort study. BMJ 2012;344:e2683.

45  Winsper C, Lereya T, Zanarini M, et al. Involvement in bullying and suicide-related behavior at 11 years: a prospective birth cohort study. J Am Acad Child Adolesc Psychiatry 2012;51:271–82.e3.

46  Bannink R, Broeren S, van de Looij-Jansen PM, et al. Cyber and traditional bullying victimization as a risk factor for mental health problems and suicidal ideation in adolescents. PLoS One 2014;9:e94026.

47  Nakamoto J, Schwartz D. Is peer victimization associated with academic achievement? A meta-analytic review. Soc Dev 2010;19:221–42.

48  Schwartz D, Gorman AH, Nakamoto J, et al. Victimization in the peer group and children's academic functioning. J Educ Psychol 2005;79:425–35.

49  Vaillancourt T, Brittain H, McDougall P, et al. Longitudinal links between childhood peer victimization, internalizing and externalizing problems, and academic functioning: developmental cascades. J Abnorm Child Psychol 2013;41:1203–15.

50  Foshee VA, McNaughton Reyes HL, Vivolo-Kantor AM, et al. Bullying as a longitudinal predictor of adolescent dating violence. J Adolesc Health 55:439–44.

51  Vaillancourt T, McDougall P. The link between childhood exposure to violence and academic achievement: complex pathways. J Abnorm Child Psychol 2013;41:1177–8.

52  Arseneault L, Bowes L, Shakoor S. Bullying victimization in youths and mental health problems: "Much ado about nothing"? Psychol Med 2010;40:717–29.

53  Juvonen J, Graham S, Schuster MA. Bullying among young adolescents: the strong, the weak, and the troubled. Pediatrics 2003;112:1231–7.

54  Ttofi MM, Farrington DP, Lösel F, et al. The predictive efficiency of school bullying versus later offending: A systematic/meta-analytic review of longitudinal studies. Crim Behav Ment Health 2011;21:80–9.

55  Stapinski LA, Bowes L, Wolke D, et al. Peer victimization during adolescence and risk for anxiety disorders in adulthood: a prospective cohort study. Depress Anxiety 2014;31:574–82.

56  Takizawa R, Maughan B, Arseneault L. Adult health outcomes of childhood bullying victimization: evidence from a five-decade longitudinal British birth cohort. Am J Psychiatry 2014;171:777–84.

57  Wolke D, Copeland WE, Angold A, et al. Impact of bullying in childhood on adult health, wealth, crime, and social outcomes. Psychol Sci 2013;24:1958–70.

58  Sourander A, Brunstein Klomek A, Kumpulainen K, et al. Bullying at age eight and criminality in adulthood: findings from the Finnish Nationwide 1981 Birth Cohort Study. Soc Psychiatry Psychiatr Epidemiol 2011;46:1211–19.

59  Bender D, Losel F. Bullying at school as a predictor of delinquency, violence and other anti-social behaviour in adulthood. Crim Behav Ment Health 2011;21:99–106.

60  Renda J, Vassallo S, Edwards B. Bullying in early adolescence and its association with anti-social behaviour, criminality and violence 6 and 10 years later. Crim Behav Ment Health 2011;21:117–27.

61  Sourander A, Jensen P, Ronning JA, et al. Childhood bullies and victims and their risk of criminality in late adolescence: the Finnish From a Boy to a Man Study. Arch Pediatr Adolesc Med 2007;161:546–52.

62  Sourander A, Jensen P, Ronning JA, et al. What is the early adulthood outcome of boys who bully or are bullied in childhood? The Finnish "From a Boy to a Man" study. Pediatrics 2007;120:397–404.

63  Brunstein-Klomek A, Sourander A, Kumpulainen K, et al. Childhood bullying as a risk for later depression and suicidal ideation among Finnish males. J Affect Disord 2008;109:47–55.

64  Copeland WE, Wolke D, Lereya ST, et al. Childhood bullying involvement predicts low-grade systemic inflammation into adulthood. Proc Natl Acad Sci USA 2014;111:7570–5.

65  Sigurdson JF, Wallander J, Sund AM. Is involvement in school bullying associated with general health and psychosocial adjustment outcomes in adulthood? Child Abuse Negl 2014;38:1607–17.

66  Niemelä S, Brunstein-Klomek A, Sillanmäki L, et al. Childhood bullying behaviors at age eight and substance use at age 18 among males. A nationwide prospective study. Addict Behav 2011;36:256–60.

67  Brunstein Klomek A, Sourander A, Gould MS. The association of suicide and bullying in childhood to young adulthood: a review of cross-sectional and longitudinal research findings. Can J Psychiatry 2010;55:282–8.

68  Brunstein-Klomek A, Sourander A, Niemelä S, et al. Childhood bullying behaviors as a risk for suicide attempts and completed suicides: A population-based birth cohort study. J Am Acad Child Adolesc Psychiatry 2009;48:254–61.

69  Brown S, Taylor K. Bullying, education and earnings: evidence from the National Child Development Study. Econ Educ Rev 2008;27:387–401.

70  Lehti V, Klomek AB, Tamminen T, et al. Childhood bullying and becoming a young father in a national cohort of Finnish boys. Scand J Psychol 2012;53:461–6.

71  Lehti V, Sourander A, Klomek A, et al. Childhood bullying as a predictor for becoming a teenage mother in Finland. Eur Child Adolesc Psychiatry 2011;20:49–55.

72  Bogart LM, Elliott MN, Klein DJ, et al. Peer victimization in fifth grade and health in tenth grade. Pediatrics 2014;133:440–7.

73  Sutton J, Smith PK, Swettenham J. Social cognition and bullying: Social inadequacy or skilled manipulation? Br J Dev Psychol 1999;17:435–50.

74  Ouellet-Morin I, Danese A, Bowes L, et al. A discordant monozygotic twin design shows blunted cortisol reactivity among bullied children. J Am Acad Child Adolesc Psychiatry 2011;50:574–82.e3.

75  Sugden K, Arseneault L, Harrington H, et al. Serotonin transporter gene moderates the development of emotional problems among children following bullying victimization. J Am Acad Child Adolesc Psychiatry 2010;49:830–40.

76  Shalev I, Moffitt TE, Sugden K, et al. Exposure to violence during childhood is associated with telomere erosion from 5 to 10 years of age: a longitudinal study. Mol Psychiatry 2012;18:576–81.

77  Harkness KL, Stewart JG, Wynne-Edwards KE. Cortisol reactivity to social stress in adolescents: role of depression severity and child maltreatment. Psychoneuroendocrinology 2011;36:173–81.

78  Segerstrom SC, Miller GE. Psychological stress and the human immune system: a meta-analytic study of 30 years of inquiry. Psychol Bull 2004;30:601–30.

79  Kaptoge S, Di Angelantonio E, Lowe G, et al; Emerging Risk Factors Collaboration. C-reactive protein concentration and risk of coronary heart disease, stroke, and mortality: an individual participant meta-analysis. Lancet 2010;375:132–40.

80  Jousilahti P, Salomaa V, Rasi V, et al. Association of markers of systemic inflammation, C reactive protein, serum amyloid A, and fibrinogen, with socioeconomic status. J Epidemiol Community Health 2003;57:730–3.

81  Sapolsky RM. The influence of social hierarchy on primate health. Science 2005;308:648–52.

82  Mezulis AH, Abramson LY, Hyde JS, et al. Is There a universal positivity bias in attributions? A meta-analytic review of individual, developmental, and cultural differences in the self-serving attributional bias. Psychol Bull 2004;130:711–47.

83  Teicher MH, Samson JA, Sheu YS, et al. Hurtful words: association of exposure to peer verbal abuse with elevated psychiatric symptom scores and corpus callosum abnormalities. Am J Psychiatry 2010;167:1464–71.

84  Brown V, Clery E, Ferguson C. Estimating the prevalence of young people absent from school due to bullying. Nat Centre Soc Res 2011;1:1–61.

85  Masiello M, Schroeder D, Barto S, et al. The cost benefit: a first-time analysis of savings. Highmark Foundation, 2012:1–13.

86  Brown V, Clery E, Ferguson C. Estimating the prevalence of young people absent from school due to bullying. National Centre for Social Research. http://redballoonlearner.co.uk/includes/files/resources/261298927_red-balloon-natcen-research-reportpdfBrown, 2011:1–61.

87  Chamberlain T, George N, Golden S, et al. Tellus4 national report: National Foundation for Educational Research. The Department for Children, Schools and Families, 2010.

88  Scrabstein JC, Merrick J. Bullying is everywhere: an expanding scope of public health concerns. Int J Adolesc Med Health 2012;24:1.

89  Dale J, Russell R, Wolke D. Intervening in primary care against childhood bullying: an increasingly pressing public health need. J R Soc Med 2014;107:219–23.

## MOTION TO SEAL CASE DOCUMENTS

With the knowledge that the magistrate judge has about the seriousness of this case and the subsequent criminal prosecutions and investigations taking place concerning the matters that plaintiff has made the judge aware of, it is clear that the documents and orders entered in the case Bonner v. Justia Incorporated which originally began captioned as Bonner v. Huber must be sealed to protect the plaintiff from harassment and defaming internet exposure which would further the emotional distress and exasperate the problem. The case documents and orders entered so far are to be sealed.

Hon. Peter G. Sheridan, U.S.D.J. _____

## CERTIFICATION OF MOTION

I certify that this motion to seal is being served to the defendant's attorney Ryan F. Michaleski

by way of United States Postal Service.

Plaintiff: Andrew K. Bonner Jr.

4-23-19

MOTION TO DISMISS THE REQUESTS OF INTERVENOR EUGENE VOLOKH

Plaintiff enters this motion to dismiss the intervenor Eugene Volokh from the matters of this case. This motion to dismiss Eugene Volokh is perfectly reasonable due to the fact that he is a direct enemy of the plaintiff who is currently under criminal investigation of matters that the plaintiff must give testimony to. By trying to contact Plaintiff and mail things to Plaintiff and try to mess up Plaintiff's lawsuit and threaten to defame Plaintiff on the internet, Eugene Volokh proves to be a nuisance. Eugene Volokh is harassing the plaintiff, he is intimidating the plaintiff, he is obstructing justice, and he has threatened to cyber-harass the plaintiff. For these reasons as well as the criminal investigations of this individual Eugene Volokh by college law enforcement, state law enforcement, federal law enforcement, and municipal law enforcement which are investigations which Andrew must give evidence and testimony to, Eugene Volokh must be dismissed from this case Bonner v. Justia Incorporated. Eugene Volokh is only trying to retaliate against the plaintiff. Also, it would obviously be improper for the court to allow Eugene Volokh to affect Plaintiff's civil case as an annoying intervenor before plaintiff has to testify against him in a criminal prosecution of which Plaintiff initiated against him. Eugene Volokh must be dismissed from the case in order to prevent intimidation of a witness victim or informant, prevent obstruction of justice, prevent further harassment, and to not condone cyber-harassment.

For these reasons as well as others made clearly apparent or recognized by the court IT IS HEREBY ORDERED THAT EUGENE VOLOKH IS DISMISSED FROM INTERVENING IN THIS CASE OF BONNER V. JUSTIA INCORPORATED ON THE ISSUES OF THE MOTION TO SEAL AND MOTION TO DISMISS.

Hon. Peter G. Sheridan, U.S.D.J. _____

CERTIFICATION OF MOTION

I certify that this motion to dismiss Eugene Volokh from the matters of the case is being served

to the defendant's attorney Ryan F. Michaleski by way of United States Postal Service, and is

only being served to Eugene Volokh as a way of notice to stop trying to intervene in the matters

of the case, and also to stop mailing things to the plaintiff's address. Plaintiff Andrew K. Bonner

Jr. has no desire to receive any mail from Eugene Volokh and the plaintiff currently has a

criminal complaint against Eugene Volokh.

Plaintiff: Andrew K. Bonner Jr.


4-23-19

Eugene Volokh is in default

No service is required for Eugene Volokh because he will be in default for failure to appear.

Therefore, the plaintiff need not serve any papers to him. Also, Plaintiff does not want to give

him any reason to think that he has a right to receive the case matter or receive case notices or to

try to contact the plaintiff again.

THESE ARE NOT PUBLIC DOCUMENTS, THEY ARE PRIVATE AND ARE TO BE KEPT CONFIDENTIAL.



PRIORITY MAIL ★ EXPRESS™

FASTEST SERVICE IN THE U.S.

ED INTERNATIONALLY, CUSTOMS DECLARATION MAY BE REQUIRED.

2013 OD: 12.5 x 9.5

001000006

EI 236856965 US

RECEIVED

APR 26 2019

CHAMBERS OF US DISTRICT JUDGE
PETER G. SHERIDAN

U.S. POSTAGE PAID
PME 1-Day
RICHWOOD, NJ
08074
APR 24, 19
AMOUNT
**$25.50**
R2305M144484-06

1007

08608

PRESS HARD. YOU ARE MAKING 3 COPIES.

**ORIGIN (POSTAL SERVICE USE ONLY)**

| | | |
|---|---|---|
| PO ZIP Code: 08074 | Day of Delivery: ☐ Next ☐ 2nd ☐ 2nd Del. Day | $ 25.50 |
| Date Accepted (Mo. Day Year): 4 24 19 | Scheduled Date of Delivery (Month Day): 4 25 19 | Return Receipt Fee $ |
| Time Accepted: 4:20 ☐ AM ☒ PM | Scheduled Time of Delivery: ☒ Noon ☐ 3 PM | COD Fee $ / Insurance Fee $ |
| Flat Rate ☐ or Weight: 13.6 lbs. | Military: ☐ 2nd Day ☐ 3rd Day<br>Int'l Alpha Country Code | Total Postage & Fees $ 25.50<br>Acceptance Emp. Initials |

**DELIVERY (POSTAL USE ONLY)**

| | | |
|---|---|---|
| Delivery Attempt Mo. Day | Time ☐ AM ☐ PM | Employee Signature |
| Delivery Attempt Mo. Day | Time ☐ AM ☐ PM | Employee Signature |
| Delivery Date Mo. Day | Time ☐ AM ☐ PM | Employee Signature |

**CUSTOMER USE ONLY**

PAYMENT BY ACCOUNT
Express Mail Corporate Acct. No.

Federal Agency Acct. No. or Postal Service Acct. No.

☐ **WAIVER OF SIGNATURE** *(Domestic Mail Only)* Additional merchandise insurance is void if customer requests waiver of signature. I wish delivery to be made without obtaining signature of addressee or addressee's agent (if delivery employee judges that article can be left in secure location) and I authorize that delivery employee's signature constitutes valid proof of delivery.

NO DELIVERY ☐ Weekend ☐ Holiday

Mailer Signature

**FROM:** (PLEASE PRINT) PHONE ( )

**TO:** (PLEASE PRINT) PHONE ( )

ZIP + 4 (U.S. ADDRESSES ONLY. DO NOT USE FOR FOREIGN POSTAL CODES.)

FOR INTERNATIONAL DESTINATIONS, WRITE COUNTRY NAME BELOW.

**FOR PICKUP OR TRACKING**
Visit **www.usps.com**
Call 1-800-222-1811

EMS

+ Money Back Guarantee for U.S. dest...

VISIT US AT USPS.COM®
ORDER FREE SUPPLIES ONLINE

UNITED STATES POSTAL SERVICE®

This packaging is the property of the U.S. Postal Service® and is provided solely for use in sending Priority Mail Express™ shipments. Misuse may be a violation of federal law. This packaging is not for resale. EP13F © U.S. Postal Service; July 2013; All rights reserved.